U. S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

FILED

JUL 2 9 2020

IN OPEN COURT
JAMES W.. McCORMACK, CLERK
BY: _H·Clayk____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 4:20-CR-132 LPR |
| | ) | |
| KEITH BENSON | ) | 18 U.S.C. § 371 |

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

### COUNT ONE

At all times relevant to this Information:

#### General Allegation and Introduction

1.    As detailed here, Defendant KEITH BENSON along with ALBERT GLENN HUDSON,
DEREK CLIFTON, JOE DAVID MAY a.k.a. JAY MAY, DONNA CROWDER, JENNIFER
CROWDER, f.k.a. JENNIFER BRACY, and others known to the United States Attorney conspired
in a scheme to pay and receive kickbacks and to generate fraudulent prescriptions for compounded
drugs that were signed without regard to medical necessity or examining patients and to conceal
the truth from the pharmacy, TRICARE, and law enforcement alike. Unbeknownst to TRICARE,
kickbacks were often paid at every level: to beneficiaries to get the drugs, to recruiters to find
beneficiaries, and to medical professionals to rubber stamp prescriptions. TRICARE paid more
than $12 million for fraudulent prescriptions issued to its beneficiaries through this scheme.

#### TRICARE

2.    TRICARE was a program of the United States Department of Defense that provided health
care insurance coverage for military personnel, retirees, their families, and survivors. It qualified
as a health care benefit program under Title 18, United States Code, Section 24(b) and a federal

health care program affecting commerce under Title 42, United States Code, Section 1320a-7b.

3.   Persons covered by TRICARE were called "TRICARE beneficiaries."

4.   TRICARE provided prescription drug coverage (including for certain compounded drugs).

5.   Express Scripts, Inc. was a Pharmacy Benefit Manager that processed prescription drug claims on behalf of TRICARE.

6.   TRICARE and Express Scripts processed and paid prescription drug claims in good faith reliance on the fact that the drugs were dispensed pursuant to valid prescriptions. In other words, TRICARE and Express Scripts would not have paid for prescription drugs had they known drugs had not been issued pursuant to valid prescriptions. Valid prescriptions were those signed by licensed medical professionals after examining patients and determining that the drugs prescribed were medically necessary to treat their illness or condition.

7.   TRICARE and Express Scripts also processed and paid prescription drug claims in good faith reliance on the fact that kickbacks had not been offered, paid, solicited, or received in the course of generating the prescriptions. Had they known any kickbacks were involved, TRICARE and Express Scripts would have refused payment.

Compounded Drugs

8.   Compounding was a practice in which a licensed pharmacist combined, mixed, or altered ingredients of a drug in response to a prescription to create medication tailored to the needs of an individual patient. For example, when a patient is allergic to an ingredient in an FDA-approved medication, such as a dye or preservative, a compounded drug can be prepared excluding the substance that triggers the allergic reaction. Compounded drugs may also be prescribed where a patient cannot consume a medication by traditional means, such as a patient who cannot swallow an FDA-approved pill and therefore needs the drug in liquid form.

9.    Pharmacies engaged in this practice were called "compounding pharmacies."

Relevant Parties

10.   Pharmacy 1 was a compounding pharmacy in Mississippi. Upon receipt of prescriptions, Pharmacy 1 shipped its compounded drugs to patients around the country via commercial interstate carriers and the United States Postal Service ("interstate carriers") and billed the patients' insurers for reimbursement. Pharmacy 1 paid marketers to promote its drugs.

11.   Marketer 1 (dba Entity 1) lived in Tennessee and promoted Pharmacy 1 compounded drugs through various promoters around the country.

12.   ALBERT GLENN HUDSON (HUDSON) dba MAJOR HEALING, LLC (MAJOR HEALING) lived in Little Rock, Arkansas and promoted Pharmacy 1 compounded drugs for Entity 1. HUDSON paid KEITH BENSON (BENSON), Recruiter 2, Recruiter 3, Recruiter 4, and Recruiter 5, among others ("HUDSON Recruiters"), to find TRICARE beneficiaries to receive the drugs. HUDSON then paid others, including DEREK CLIFTON, to get medical professionals, including JOE DAVID MAY a.k.a. JAY MAY, to rubber stamp prescriptions for the TRICARE beneficiaries.

13.   DEREK CLIFTON (CLIFTON) dba JC CUSTOM MEDICAL, LLC (JC CUSTOM) lived in Little Rock, Arkansas. CLIFTON had worked in the medical sales industry since 2010, during which time he received compliance training on the Anti-Kickback Statute. Before entering medical sales, CLIFTON coached high school basketball in Baxter County, Arkansas. CLIFTON recruited TRICARE beneficiaries himself and paid Recruiter 6, Recruiter 7, and Recruiter 8, among others ("Clifton Recruiters"), to find still more TRICARE beneficiaries to receive the drugs. CLIFTON paid JOE DAVID MAY a.k.a. JAY MAY to rubber stamp prescriptions for TRICARE beneficiaries recruited by CLIFTON himself, Clifton Recruiters, and HUDSON Recruiters.

3

14.   JOE DAVID MAY a.k.a. JAY MAY (MAY) lived in Alexander, Arkansas and was a medical doctor licensed to practice in Arkansas. When applying for his license in 2012, MAY indicated he "prefer[s] to go by Jay" and swore and affirmed he read the Rules and Regulations of the Arkansas State Medical Board. Since 2014, MAY worked for a community hospital system and practiced at several of its locations around the state including Hospital 1 in Hot Spring County, Arkansas. MAY and CLIFTON were longtime friends. MAY rubber stamped prescriptions from CLIFTON in exchange for cash.

15.   DONNA CROWDER (CROWDER) was a Registered Nurse Practitioner licensed in Arkansas who rubber stamped prescriptions from HUDSON in exchange for payments to her daughter, JENNIFER CROWDER f.k.a. JENNIFER BRACY (BRACY).

16.   Prescriber 2 was a medical doctor licensed in Arkansas.

### Formation of TRICARE Prescription Network

17.   In or around January 2015, HUDSON agreed to market Pharmacy 1 drugs for Entity 1. His contract with Entity 1 required complying with the "Anti-Kickback Statute" and prohibited "directly or indirectly, paying or providing, arranging for the provision of, or giving anything of value in any form, to health care providers, their patients, [or] their family[.]"

18.   Pre-printed, check-the-box prescription forms listed Pharmacy 1's available compounds, which included various pain creams, scar creams, and supplements. Prescribers therefore needed only to check the box beside the drug(s), enter the number of refills (if any), and sign their name. An empty field for patient insurance information appeared at the top of the prescription form.

19.   Marketer 1 said marketing for Pharmacy 1 was lucrative because TRICARE paid thousands of dollars per month, per patient for its drugs and shipped refills automatically.  Marketer 1 advised HUDSON focus on generating TRICARE prescriptions and suggested HUDSON use prescribers

4

he could trust to *rubber stamp* prescriptions—that is, sign without examining patients.

20.  In or around January 2015, HUDSON began forming a network to generate prescriptions. This required two things: prescribers to prescribe the drugs and beneficiaries to receive them.

*Prescribers*

21.  HUDSON arranged to pay BRACY $1,000 per patient in exchange for her mother, CROWDER, rubber stamping *pre-filled prescriptions*—that is, prescriptions with patient insurance information, drug(s) to be dispensed, and, often, refill quantities already entered so the prescriber need only sign at the bottom—without examining patients or knowing anything about them (*e.g.*, medical history, physical condition, chief complaint, current medications). HUDSON then struck a similar deal with a friend who said Prescriber 2 would rubber stamp pre-filled prescriptions.

22.  In or around January 2015, CLIFTON told HUDSON that MAY would also rubber stamp pre-filled prescriptions. HUDSON and CLIFTON then signed a "Distributor Agreement" that set CLIFTON's compensation at twenty percent of sales he generated, required compliance with laws on "Enticements" and "Kickbacks[,]" and barred "compensat[ing] a Healthcare Provider in any way[.]" Nevertheless, with HUDSON's knowledge, CLIFTON paid MAY to sign prescriptions, and CLIFTON offered certain TRICARE beneficiaries money to receive the drugs.

*TRICARE Beneficiaries*

23.  Beginning in or around January 2015, having now secured prescribers, HUDSON enlisted recruiters to find TRICARE beneficiaries willing to receive the drugs. They included BENSON, Recruiter 2, Recruiter 3, Recruiter 4, and Recruiter 5 among others (HUDSON Recruiters).

24.  HUDSON Recruiters were told TRICARE paid thousands of dollars per month per patient for the drugs, Pharmacy 1 shipped refills automatically, and he (HUDSON) could get *anyone* with

TRICARE a prescription, regardless of where they lived. HUDSON said beneficiaries would not have to be examined by prescribers or share medical information (*e.g.*, medical history, physical condition, chief complaint, current medications). Rather, all HUDSON needed to generate prescriptions was the patient insurance information called for by Pharmacy 1's prescription forms.

25. HUDSON gave pre-printed prescription forms to HUDSON Recruiters, telling them TRICARE beneficiaries could select whatever drugs they liked while also advising recruiters to push the most expensive drugs. If TRICARE beneficiaries did not care what drugs they received, HUDSON indicated he or the HUDSON Recruiters could select the drugs themselves.

26. Although the job entailed recruiting TRICARE beneficiaries, HUDSON Recruiters signed "Distributor Agreement[s]" that described the job as "market[ing] the Products to physicians, clinics, and healthcare facilities"—that is, "professionals...authorized to prescribe the Products." Compensation generally equaled twenty percent of sales generated, which in practice meant twenty percent of whatever TRICARE paid for prescriptions issued to beneficiaries the recruiter provided. Contracts required compliance with laws on "Kickbacks." Nevertheless, with HUDSON's knowledge, HUDSON Recruiters solicited TRICARE beneficiaries by offering them money.

27. In addition to having MAY sign pre-filled prescriptions for TRICARE beneficiaries from HUDSON Recruiters, CLIFTON generated additional Pharmacy 1 prescriptions for MAY to sign by recruiting TRICARE beneficiaries himself and engaging others to do the same on his behalf, including Recruiter 6, Recruiter 7, and Recruiter 8, among others (Clifton Recruiters). Although the job entailed recruiting TRICARE beneficiaries, Recruiter 6, Recruiter 7, and Recruiter 8 signed the same "Distributor Agreement[s]" as HUDSON Recruiters, which mischaracterized the work.

28. Clifton Recruiters were encouraged to solicit TRICARE beneficiaries without regard to medical necessity. For example, on or about February 10, 2015, CLIFTON emailed Recruiter 6 a

"Talk Track" for use when recruiting. The script called for the recruiter to tout the pharmacy's "contract with Tricare" before asking "If I could get you a prescription for pain cream or wellness vitamins at no cost to you, would you be interested?" The script then offered counter-arguments to "Possible Objections[.]" People who objected "I don't normally take vitamins or need vitamins" were to be told "I don't blame you. We all know vitamins are good for you, but who wants to pay for them." People who objected "Why do I need pain cream? I don't suffer from chronic pain." were to be told "It's [sic] also works for minor aches and pains associated with everyday life. ... You should get it since it will be at no cost, and you can also give it to a family member that might not have as favorable coverage like you do."

29.   CLIFTON's payout for MAY's rubber stamp depended on who supplied the beneficiary. If CLIFTON or a Clifton Recruiter found the beneficiary, HUDSON paid CLIFTON twenty percent of TRICARE's payout, consistent with the terms of their "Distributor Agreement[.]" If a HUDSON Recruiter found the beneficiary and CLIFTON merely supplied MAY's signature, HUDSON paid CLIFTON a flat fee (often $1,000). This was a handshake deal. No such provision appeared in their "Distributor Agreement[.]" CLIFTON ran pre-filled prescriptions through MAY via this handshake deal despite knowing HUDSON Recruiters solicited TRICARE beneficiaries by offering them money.

Day-to-Day Operation

30.   Things ran like an assembly line: recruiters sent TRICARE beneficiaries to HUDSON, who routed them to prescribers in the form of pre-filled prescriptions to be rubber stamped.

31.   HUDSON Recruiters referred TRICARE beneficiaries to HUDSON for prescriptions by forwarding the pre-filled prescription itself *or* simply relaying TRICARE beneficiary information, which HUDSON then used to pre-fill the prescription himself.

32.   HUDSON then forwarded pre-filled prescriptions to CROWDER, Prescriber 2, or MAY, knowing each would sign (thereby authorizing drugs to be dispensed) without examining patients or demanding any medical information (*e.g.*, medical history, physical condition, chief complaint, current medications). Typically, HUDSON forwarded pre-filled prescriptions as follows:

    a.   For CROWDER, HUDSON faxed pre-filled prescriptions to her work or emailed them (as PDFs) to BRACY, who emailed them to CROWDER. CROWDER then signed the pre-filled prescriptions and faxed them to Pharmacy 1.

    b.   For Prescriber 2, HUDSON gave paper copies of pre-filled prescriptions to his friend or BENSON for hand delivery to Prescriber 2. Prescriber 2 then signed the pre-filled prescriptions and generally faxed them to Pharmacy 1.

    c.   For MAY, HUDSON emailed pre-filled prescriptions as PDFs to CLIFTON, who emailed them to MAY, who used an app on his phone to eSign. CLIFTON emailed PDFs of eSigned prescriptions to HUDSON, who emailed them to Marketer 1 for submission to Pharmacy 1. Things worked in a similar way when CLIFTON (or a Clifton Recruiter) generated the pre-filled prescription at issue. These also went to MAY via email, were eSigned, and emailed to HUDSON en route to Pharmacy 1.

33.   For his part, CLIFTON regularly described MAY's signatures as foregone conclusions:

    a.   On or about March 25, 2015, CLIFTON emailed MAY thirteen pre-filled prescriptions, writing "Here is 13. Boom! Let's get these turned in as quickly as possible." MAY signed all thirteen just thirteen minutes later.

    b.   On or about March 30, 2015, upon noticing MAY had signed one pre-filled prescription but not the other, CLIFTON emailed MAY, "Forgot to sign the 2nd one[.]" MAY then signed the second pre-filled prescription also.

    c.  On or about September 28, 2015, CLIFTON emailed Clifton Recruiters an updated Pharmacy 1 prescription form, writing "fill out new scripts for your patients and get them to me asap! I will be getting them signed tomorrow."

34.  On receipt of prescriptions, Pharmacy 1 shipped compounded drugs to the beneficiaries via interstate carriers and submitted prescription drug claims to TRICARE for reimbursement.

35.  Prescription payments went from TRICARE to Pharmacy 1, to Marketer 1, to HUDSON. After keeping a share for himself, HUDSON paid one share to HUDSON Recruiters for finding beneficiaries to receive the drugs *and* another share to those responsible for getting prescriptions rubber stamped, including CLIFTON. CLIFTON paid a share of his cut to MAY for rubber stamping prescriptions, a share to Clifton Recruiters whenever they found the beneficiary at issue, and, at times, a share to a beneficiary himself.

36.  Payments occurred monthly and often lagged one month behind the prescriptions at issue. For example, payment for January 2015 prescriptions did not take place until late February 2015.

37.  Payout reports (also called commission reports) listing every prescription for which people were paid accompanied every Marketer 1 payment to HUDSON, every HUDSON payment to his subordinates (including CLIFTON), and all CLIFTON payments to Clifton Patient Recruiters. In particular, payout reports generally reflected patient names, prescriber names, drugs dispensed, and TRICARE reimbursements.

Specific Recruiting Efforts

*CLIFTON*

38.  In or around January 2015, CLIFTON began to contact his former basketball players now in the military, including J.C., D.R., and R.H. CLIFTON called each one by phone, confirmed they had TRICARE, offered to get them (and any dependent spouses on TRICARE) drugs, and offered

9

them money to receive the drugs. All three agreed. MAY signed their prescriptions. TRICARE paid nearly $500,000. CLIFTON paid J.C. monthly, including once by check for $51 (equal to his wife's copay), and later by cash, including once sending approximately $1,200 in a Stetson cowboy hat. After D.R. received drugs, CLIFTON told him his money was on its way but it never arrived.

39.   In or around March 2015, CLIFTON began to solicit neighbors with military ties, including D.C. and E.V. After confirming they had TRICARE, he offered to get them and their spouses drugs. They agreed. MAY signed their prescriptions. TRICARE paid over $160,000.

*BENSON*

40.   In or around March 2015, BENSON met two congregants with military ties at their North Little Rock church. After confirming they had TRICARE, BENSON offered to get them drugs and to pay them $1,000 each month drugs arrived. Both agreed. Prescriber 2 signed one prescription, and MAY signed the other, which was for P.P. TRICARE paid over $50,000 for P.P.'s drugs. P.P. later received a $1,000 check signed by BENSON.

41.   On or about March 16, 2015, BENSON led a meeting at a North Little Rock National Guard facility. After confirming everyone had TRICARE, BENSON offered to get attendees drugs and promised to pay them $1,000 each month drugs arrived, adding family on TRICARE were eligible too. Numerous attendees agreed. Afterwards, BENSON texted HUDSON "Just got like 15 more." MAY, CROWDER, and Prescriber 2 signed prescriptions for attendees and family. MAY's share exceeded ten TRICARE beneficiaries, including R.L. TRICARE paid over $350,000 for their drugs. A BENSON subordinate later paid everyone who received drugs $1,000 cash.

*Recruiter 2*

42.   In or around April 2015, after confirming he had TRICARE, Recruiter 2 offered to get S.P.'s husband drugs, and offered him $700 to sign up. He agreed. Recruiter 2 then texted S.P. and

her husband's insurance information to HUDSON. Prescriber 2 signed the husband's prescription. MAY signed S.P.'s prescription. TRICARE paid over $50,000 for her drugs. Later, when the husband asked for their money, Recruiter 2 refused.

*Recruiter 3*

43.   In or around July 2015, Recruiter 3 approached B.T., whom he knew had military ties. After confirming she had TRICARE, Recruiter 3 offered to get B.T. drugs and promised to pay her $100 per month she got them. She agreed. Recruiter 3 then texted B.T.'s insurance information to HUDSON. MAY signed her pre-filled prescription but neglected to date the form. It did not process. The next month, CROWDER signed her pre-filled prescription. This time it processed. Recruiter 3 later paid B.T. $100 cash.

Fear of Falling TRICARE Reimbursements Prompts Spike

44.   On or about March 16, 2015, HUDSON forwarded an Entity 1 email to his subordinates, including CLIFTON and the HUDSON Recruiters. It warned TRICARE was implementing a "new policy" on "May 1, 2015" in order "to control reimbursement" and noted "[w]e have until May 1…let's blow it out the rest of this month and next month[.]" To this warning HUDSON added "[b]ring everything you have until May 1st!!" Volume rose, peaking near the end of April.

45.   From on or about April 20, 2015 through the end of the month, CROWDER signed over twenty pre-filled prescriptions for which TRICARE paid over $600,000, and MAY signed over fifty pre-filled prescriptions for which TRICARE paid over $1.2 million. Over half of MAY's prescriptions during this period came from HUDSON Recruiters. Most were combined into daily batches of six or seven at a time. For example:

   a.   On or about April 20, 2015, CLIFTON emailed MAY seven pre-filled prescriptions (including R.L.'s) shortly before 7:00 p.m., writing "7 of them[.]" MAY eSigned

11

all seven at approximately 1:38 a.m.

    b.  On or about April 21, 2015, CLIFTON emailed MAY another seven pre-filled prescriptions, writing "7 I think." MAY eSigned all seven the next morning.

    c.  On or about April 22, 2015, CLIFTON emailed MAY six pre-filled prescriptions, writing "6 on this one[.]" MAY eSigned all six the next morning.

    d.  On or about April 23, 2015, CLIFTON emailed MAY six pre-filled prescriptions (including several from the National Guard meeting), writing "Keep em rolling[.]" MAY eSigned all six that afternoon.

    e.  On or about April 24, 2015, CLIFTON emailed MAY a batch of six pre-filled prescriptions followed by two more pre-filled prescriptions in two separate emails. MAY eSigned all eight within ninety minutes. Minutes after they were signed, CLIFTON emailed MAY another seven pre-filled prescriptions, which he eSigned early the next week.

    f.  On or about April 30, 2015, CLIFTON emailed MAY nine pre-filled prescriptions, including a batch of six, which he eSigned nine minutes later.

Red Flags Emerge and TRICARE Shuts Down

46.  On or about May 5, 2015, CBS News aired an exposé about compounding pharmacies and drug reps targeting servicemembers to receive pain and scar cream, for which TRICARE had been paying hundreds of millions of dollars every month.

47.  On or about May 7, 2015, HUDSON texted CLIFTON a link to the exposé, appearing under the title "Free pain meds for veterans cost taxpayers big bucks." When they later discussed the story, CLIFTON joked about going to jail for selling glorified lotions.

48.  Days later, starting on or about May 11, 2015, TRICARE stopped processing compounded

drug claims.

49. On or about May 15, 2015, a Pharmacy 1 employee sent Marketer 1 an email about patient complaints from Arkansas, which he forwarded to HUDSON. One complaint reported a "pyramid scheme" involving "paying people to recruit other people" where patients "fill out [their] own prescription[,]" which goes to a "doctor who was a friend…'on the downlow.'" Another complaint involved a situation where the prescriber ("doctor Joe May"), who the patient "doesn't even know," did not prescribe "what [the patient] requested on her 'sheet.'" The email ended: "If any of these patients should choose to call Tricare we can have serious repercussions."

50. On or about May 18, 2015, the Pharmacy 1 representative sent Marketer 1 a follow-up email, which he again forwarded to HUDSON. It explained: "The first patient called because she thought we were committing fraud. …[S]he filled out a prescription pad and was wondering how we were filling prescriptions without a doctor signing them because she hadn't seen a doctor. She was also told that it woud [sic] be given to a doctor to be taken care of but that that was basically to be keep [sic] on the down low. She called us to accuse of us fraudulently filling prescriptions. Luckily she called us and not Tricare[.]" It went on: "The second patient is not confused about a doctor. She was never seen by any physician. She was also asked to fill out a questionnaire and request which prescriptions she wanted. She knew it was going to be given to Doctor May, but he prescribed her something other than what she requested."

51. HUDSON discussed the Pharmacy 1 emails with his subordinates, including CLIFTON. Given the CBS News exposé, TRICARE shutdown, and Pharmacy 1 emails, from that point forward, all agreed TRICARE beneficiaries needed to act as if they had consulted their prescriber and deny being paid.

### TRICARE Resumes

52.   Later that summer, TRICARE resumed processing compounded drug claims (albeit for less money) for certain new Pharmacy 1 compounded drugs, which required new prescriptions.

53.   In or around July 2015, HUDSON confirmed whether CROWDER, Prescriber 2, and MAY would rubber stamp prescriptions. CLIFTON signaled MAY would do so, texting HUDSON on or about July 23, 2015, "Did you need Dr. May to sign anything?" HUDSON replied "Yes."

54.   HUDSON warned recruiters TRICARE beneficiaries should know their prescriber's name because Pharmacy 1 may call before shipping drugs. Accordingly, HUDSON sent lists of which TRICARE beneficiaries were going through which prescribers. For example:

    a.   On or about July 26, 2015, HUDSON texted Recruiter 4:

> [T.M.]: dr may
> [Redacted]: dr crowder
> [Redacted]: dr crowder
> [Redacted]: dr crowder
> [Redacted]: [Prescriber 2]
>
> Let your people know that this is who there [*sic*] doctor is. Pharmacy shouldn't ask when they call, but just to give heads up.

    b.   After giving him a printed list of TRICARE beneficiaries and their prescribers, on or about July 26, 2015, HUDSON texted BENSON: "double and triple check to make sure your people know who their doctor is. … no slip up's, no excuses this time around. too much scrutiny … . All will be getting sent in starting tomorrow unless i hear otherwise on your peeps. lets [*sic*] roll[.]"

    c.   On or about July 26, 2015, HUDSON texted another recruiter:

> [Redacted]: [Prescriber 2]
> [Redacted]: dr crowder
> [Redacted]: dr crowder

Pharmacy will call first and they usually don't ask your doctors name, but this is who your doctors are if they ask. Getting items sent this week.

d.  On or about July 27, 2015, HUDSON texted Recruiter 5: "Reminder that the pharmacy will call on first go around. They don't ask who there [sic] doctor is, but dr crowder is all of there [sic] doctors. Let them know that just in case. … I'll get all of yours sent in the first part of this week[.]" Recruiter 5 then asked "What were the Rx … since if they ask, they don't even know Ha!"

e.  On or about July 28, 2015, in reference to B.T., HUDSON texted Recruiter 3 "Going to put your lady in if that's still a green light." He replied "GREEN[.]" The next morning, HUDSON texted Recruiter 3: "She'll go in tomorrow. Pain, scar, anti-fungal cream Dr. May is doctor[.]"

f.  On or about July 29, 2015, when another recruiter texted HUDSON "what is the talk track the patients need to have?" HUDSON replied "That they knew and saw there [sic] doctor."

55.  Around the same time, on or about July 25, 2015, MAY and his wife left for an eleven-day vacation to Southern California. He continued to sign prescriptions while away:

a.  On or about July 28, 2015, CLIFTON emailed MAY four pre-filled prescriptions for beneficiaries from HUDSON, writing "[p]lease sign as soon as you can." Minutes later, CLIFTON emailed MAY updated copies, writing "Don't sign the first four I sent you. Sign these instead. Hope you guys are enjoying your vacation!" Later that evening MAY eSigned all four. Included in the batch was T.M.

b.  On or about July 29, 2015, CLIFTON emailed MAY a pre-filled prescription for B.T., writing "1 more." MAY eSigned it twenty-two minutes later.

### Federal Agent Scare Curbs Out-of-State Prescriptions

56.   On or about July 29, 2015, a federal agent called TRICARE beneficiary M.R. to discuss his drugs. (M.R. was recruited by Recruiter 4 and prescribed drugs (sans consult) by Prescriber 2.) Before calling the agent back, M.R. called Recruiter 4, who called HUDSON. Recruiter 4 texted HUDSON: "Where is [Prescriber 2]'s office? Is it a clinic? He wants to get his ducks in a row for when he talks to them[.]" HUDSON replied: "He's an Ortho surgeon. I'd say he went there as he was contemplating having knee surgery. Decided not to do surgery, but was allowed to try pain cream for pain and scar cream for old scars." After another call with Recruiter 4, HUDSON texted: "Agree with you on not giving them any info other than what they ask. I wouldn't even mention the surgery stuff unless they just asked more questions. I'd be very vague." When interviewed later that afternoon, M.R. falsely claimed to have been personally examined by Prescriber 2.

57.   HUDSON alerted others about the federal agent's call, including CLIFTON. To this point, the network had run pre-filled prescriptions for TRICARE beneficiaries from over a dozen states through Arkansas prescribers. Suspecting the federal agent's interest had been triggered because M.R. lived in Texas, from then on, HUDSON refused to run any new out-of-state prescriptions, CLIFTON had MAY sign just one out-of-state prescription (for someone who had been receiving drugs since January), and Prescriber 2 stopped signing prescriptions altogether.

### Late-August Surge Alarms Pharmacy 1

58.   On or about August 26, 2015, CLIFTON texted HUDSON "We don't need new scripts for the scar do we?" HUDSON replied "Yes. If you want to [*sic*] higher reimbursements" to which CLIFTON answered, "Well shit!!!!! Why do I not have the script pad?" Later that evening, CLIFTON emailed Recruiter 6 the new prescription form with MAY listed in the prescriber field, writing "[t]his one already has the Dr. info placed on it."

59.   Under two hours later, CLIFTON emailed MAY eighteen pre-filled prescriptions on the updated prescription form. The subject line read "21[.]" One minute later, CLIFTON emailed him four more pre-filled prescriptions, writing "[c]orrection on last one. Should be 18 This one is 4[.]" MAY eSigned the batch of eighteen within an hour and eSigned the other four the next morning. Every prescription called for pain and scar cream with four refills. (Several included a third drug.) Included in the batch of eighteen was TRICARE beneficiary S.H., who never agreed to get drugs, did not know MAY, and refused his prescription when Pharmacy 1 called.

60.   On or about August 27, 2015, Pharmacy 1 received all twenty two prescriptions within minutes of each other and reacted with alarm. That evening, HUDSON texted CLIFTON: "[Marketer 1] called and asked if dr may could call and talk to [Redacted] at the pharmacy to verify things with them. They were pretty upset today about what happened, but would feel better if the pharmacist could talk to him. i think they just want to make sure he is a real doctor and none [*sic*] is forging signatures or anything."

61.   HUDSON and CLIFTON discussed the call over the coming days. Both understood that if patients must pretend they consulted their prescriber whenever they came into contact with Pharmacy 1, then MAY must do the same. MAY spoke to Pharmacy 1 by phone on or about August 31, 2015. After that conversation, Pharmacy 1 continued to process his prescriptions.

Scheme Winds Down

62.   TRICARE reimbursements fell as the year progressed, leaving less money to go around. For example, on or about November 12, 2015, Recruiter 5 complained how little money was left after paying patients, texting HUDSON "Might be able to buy myself a taco after I send out checks plus copays." November 2015 was the last month for which HUDSON or his subordinates would be paid for generating compounded drug prescriptions.

63.   TRICARE paid over $12 million for compounded drugs prescribed through this scheme, for which Marketer 1 paid HUDSON over $3.9 million, which he then shared with subordinates, including CLIFTON, who received over $740,000 for generating prescriptions via MAY.

64.   CROWDER prescribed compounded drugs to over 60 beneficiaries, for which TRICARE paid over $5 million. Prescriber 2 prescribed compounded drugs to over 25 beneficiaries, for which TRICARE paid over $2.5 million. MAY prescribed compounded drugs to over 100 beneficiaries, for which TRICARE paid over $4.5 million. MAY's beneficiaries came from eight different states, extending from California to Connecticut. With one exception, neither his employer nor TRICARE had records MAY ever examined them. Similarly, toll records reflect no contact by phone between MAY and TRICARE beneficiaries for whom he prescribed millions in drugs.

Patient M.H.

65.   M.H. was the only TRICARE beneficiary for whom TRICARE or MAY's employer had any treatment records. In or around January 2015, 91-year-old M.H. was admitted to Hospital 1. She was a TRICARE beneficiary because her late husband served in World War II.

66.   MAY examined M.H. throughout her stay, including on consecutive days from on or about January 19, 2015 to on or about January 24, 2015. MAY signed progress notes documenting all six interactions. Each one indicated M.H. suffered from "dementia" that may require "1 to 1" care, M.H. "reports no pain," and he saw M.H. to be "in no acute distress and not in pain." Nevertheless, on or about January 24, 2015, MAY signed a prescription for M.H. to receive compounded pain cream from Pharmacy 1 (including 11 refills).

67.   During M.H.'s stay at Hospital 1, staff (including MAY) recorded any medications she was to receive in her patient chart, even non-prescription-strength medication. For example, on or about January 20, 2015, MAY noted M.H. was to receive Tylenol. Nowhere in her record did MAY note

M.H. had been prescribed or was to receive compounded pain cream.

68.   M.H.'s prescription was faxed to Pharmacy 1 on or about January 25, 2015. It listed her address (to which drugs would be sent) as an assisted living facility. MAY's progress note on that date indicated M.H. "is not going to be able to return to ALF [Assisted Living Facility] at this time, I recommend she be sent to SNF [Skilled Nursing Facility], likely permanantly [*sic*]."

69.   TRICARE paid over $40,000 for M.H.'s pain cream, which included her initial January prescription and three refills. Payment only stopped when TRICARE temporarily shut down.

Kickbacks to MAY

70.   CLIFTON acknowledged paying kickbacks when texting with HUDSON. For example, as everyone awaited payment for April prescriptions, on or about May 28, 2015, HUDSON texted CLIFTON "Hashtag for the day... [HUDSON], is my check ready? # Lol[.]" CLIFTON replied "Haha! Meeeee toooo Jay already called asking this morning too...even the rich man[.]" Later, on or about October 12, 2015, when HUDSON asked CLIFTON if he wanted to promote a new Pharmacy 1 drug expected to net "200 commission[,]" CLIFTON replied "Prolly so. Still though $210 minus half for tax$105 [*sic*] then dr's cut then patients cut..... Yikes[.]"

71.   Clifton Recruiters also acknowledged kickbacks. Upon receipt of his April 2015 payout report showing MAY signed prescriptions for his six beneficiaries, Recruiter 7 emailed CLIFTON "What will I need to pay joe?" Upon receipt of her September 2015 payout report showing MAY signed all of her prescriptions as well, Recruiter 6 emailed CLIFTON "How much for dr?"

72.   In 2014, less than $500 in cash was deposited into bank accounts tied to MAY. By contrast, in 2015, over $15,000 in cash was deposited into the same accounts. Over $10,000 of the deposits occurred during the same three-month window at the height of the scheme, during which time over $15,000 in cash was withdrawn from bank accounts tied to CLIFTON. For example, on or about

April 6, 2015, CLIFTON withdrew $5,000 cash from his First Security Bank account -5712. The next week, on or about April 15, MAY deposited $5,000 cash into his US Bank account -0027.

## The Cover Up

73.  On or about January 21, 2016, federal agents executed search warrants at compounding pharmacies around the country, including Pharmacy 1, and began interviewing high prescribers.

74.  That same day, the FBI interviewed CROWDER and gave her a subpoena for corresponding medical records. CROWDER met with HUDSON and BRACY later that night. She told them she needed to fabricate medical records for the prescriptions because none existed. HUDSON aided this effort by giving CROWDER a list of beneficiaries for whom she prescribed and, later, warning his recruiters CROWDER may be calling beneficiaries to get details for use in the records.

75.  HUDSON spread the news of the Pharmacy 1 search warrant and the FBI contact with CROWDER to his subordinates, including CLIFTON.

76.  On or about January 26, 2016, the FBI interviewed MAY. In pertinent part, he admitted prescribing the compounded drugs at issue but denied doing so without first consulting patients or knowingly prescribing for out-of-state patients. MAY stated he prescribed compounded drugs for patients he saw clinically but acknowledged CLIFTON sometimes had him contact patients whom CLIFTON thought might benefit from the drugs. In those cases, MAY claimed he would examine the patient by telephone and, depending on what was said, he would sometimes prescribe drugs. MAY denied being offered or receiving anything of value from CLIFTON for prescribing drugs. At the end of the interview, the FBI gave MAY a subpoena for corresponding medical records.

77.  Minutes after the FBI interview ended, MAY called CLIFTON. CLIFTON then texted HUDSON "Call asap[.]" CLIFTON and HUDSON met that afternoon, and CLIFTON expressed

concern because he had paid MAY cash for signing prescriptions.

78.   A short time later, in or around late January or early February 2016, CLIFTON met with HUDSON about the MAY subpoena. CLIFTON gave HUDSON copies of several prescriptions MAY had signed for HUDSON Recruiters. CLIFTON said MAY planned to fabricate medical records in their names and, like CROWDER, MAY might call beneficiaries to get details for use in the records. CLIFTON told HUDSON to make sure the beneficiaries answered the phone if MAY called. HUDSON relayed this instruction.

Fabricated Medical Records

79.   CROWDER produced fabricated medical records on or around February 17, 2016.

80.   MAY produced fabricated medical records on or about February 29, 2016. They related to over thirty TRICARE beneficiaries, including S.P., R.L., D.C., and P.P. For each one, MAY provided a compounded drug prescription and an "Internal Medicine History and Physical" chart. The chart included fields for chief complaint, history of present illness, and surgical history, among others and listed patient name, date of birth, and the last four digits of their Social Security Number.

    a.   S.P.'s chart said she was seen "4/16/15." MAY never examined S.P.

    b.   R.L.'s chart listed his complaint as "left bicep scar" and misspelled his last name. MAY never examined R.L. Nor did R.L. have a scar on his left arm.

    c.   D.C.'s chart listed "Lumbar 3 repair" in his surgical history. MAY never examined D.C. Nor had D.C. ever undergone back surgery.

    d.   A prescription included with D.C.'s chart listed "chronic back pain" as a diagnosis. No such diagnosis appeared on the actual prescription MAY eSigned for D.C. that had been submitted to Pharmacy 1.

    e.   P.P.'s chart listed his complaint as "wrist pain" and then described his history as

"Pt w/ wrist pain s/p [status post] fracture from MVA [motor vehicle accident]. Not relief w/ OTC meds[.]" MAY never examined P.P. Nor had P.P. ever complained about wrist pain, much less from a car accident.

81.   Later, in or around March 2016, HUDSON and CLIFTON again discussed the subpoenas. They acknowledged CROWDER and MAY had each submitted fabricated records, which they believed would give them cover inasmuch as they showed (albeit falsely) patients were examined.

### HUDSON and CLIFTON Monitor Investigation

82.   It later became evident the investigation had expanded because federal agents were talking to beneficiaries. HUDSON discussed this news with various subordinates, including CLIFTON. All agreed beneficiaries must stay on message: they talked to their prescribers, and they had not been paid for their prescriptions. HUDSON and CLIFTON, among others, continued to monitor the local investigation and similar investigations elsewhere.

83.   For example, on or about March 3, 2016, HUDSON texted CLIFTON a link to a *Dallas Morning News* article about charges in a scheme involving kickbacks, "pain and scar creams" marketed to servicemembers, and prescriptions signed without a "doctor-patient relationship."

84.   Later, on or about May 27, 2016, the same day the FBI interviewed a beneficiary linked to MAY by telephone, CLIFTON texted HUDSON "people are getting called again[.]"

### Altered Payout Reports

85.   On or about June 16, 2016, HHS-OIG and the FBI interviewed BRACY about her payments from HUDSON and their relation to prescriptions signed by her mother, CROWDER. At the end of the interview, the FBI served BRACY a subpoena for her business records. HUDSON met with BRACY later that night and learned of the subpoena.

86.   On or about June 17, 2016, HUDSON created payout reports for BRACY that falsely

attributed her payments to prescriptions other than those signed by her mother. HUDSON then emailed the falsified reports to BRACY, who produced them in response to the subpoena.

87. Later that month, in or around June 2016, HUDSON altered other payout reports he had circulated in 2015, most notably by deleting references to prescriber names.

88. On or about October 25, 2016, HUDSON learned BRACY was to have a follow-up interview. HUDSON told BRACY to deny being paid for her mother's prescriptions.

89. The next day, on or about October 26, 2016, BRACY repeated this false assertion to HHS-OIG and the United States Attorney's Office.

90. On or about November 10, 2016, the FBI and HHS-OIG began serving subpoenas to additional HUDSON subordinates, including CLIFTON. HUDSON responded by circulating copies of the altered payout reports, which now omitted prescriber names.

Grand Jury Subpoena to JC Custom

91. On or about November 16, 2016, CLIFTON received a Grand Jury Subpoena for JC CUSTOM records, including any emails, prescriptions, and payout reports tied to compounding.

92. CLIFTON produced records on or about December 6, 2016. His response included no emails or prescriptions, and none of the reports CLIFTON had given Clifton Recruiters. When the FBI later searched CLIFTON's email account, it found over 200 emails related to compounding, over 400 compounded drug prescriptions, and over 20 reports CLIFTON sent to his recruiters.

93. Among the records CLIFTON did provide to the Grand Jury were monthly reports showing payments from HUDSON to CLIFTON; however, the versions CLIFTON provided had been altered a second time. Specifically, whereas reports HUDSON circulated in 2015 listed patients and prescribers, and reports HUDSON circulated in the wake of subpoenas in 2016 listed patients (but not prescribers), the reports CLIFTON produced listed neither patients nor prescribers.

23

94.   At the request of the United States Attorney's Office, on or about December 8, 2016, CLIFTON produced the reports in Microsoft Excel format through his then-attorney. Metadata in the reports indicates "Derek Clifton" had accessed the files on or about November 22, 2016.

The Charge

95.   From in or around January 2015 to in or around July 2018, both dates being approximate and inclusive, in the Eastern District of Arkansas and elsewhere, Defendant KEITH BENSON along with ALBERT GLENN HUDSON, DEREK CLIFTON, JOE DAVID MAY a.k.a. JAY MAY, DONNA CROWDER, JENNIFER CROWDER, f.k.a. JENNIFER BRACY, and others known to the United States Attorney, knowingly, voluntarily, and intentionally combined, conspired, and agreed to commit and to aid and abet the commission of the following offense against the United States:

   a.   illegal remunerations (the so-called Anti-Kickback Statute), in violation of Title 42, United States Code, Section 1320a-7b(b).

*Purpose of Conspiracy*

96.   It was a purpose of the conspiracy for Defendant and his co-conspirators to unlawfully enrich themselves by:

   a.   causing the submission of false and fraudulent claims to TRICARE  and Express Scripts for compounded drugs prescribed to TRICARE beneficiaries, which prescriptions were signed without regard to medical necessity and without prescribers examining patients;

   b.   paying and offering to pay and receiving kickbacks: to induce TRICARE beneficiaries to receive the drugs, to induce recruiters to refer TRICARE beneficiaries for prescriptions, and to induce prescribers to rubber stamp

prescriptions without regard to medical necessity and without examining patients; *and*

c.   concealing and disguising these facts from Pharmacy 1, TRICARE, Express Scripts, and law enforcement.

*Manner and Means*

97.   The objects of the conspiracy were to be carried out in the following ways, among others,

a.   HUDSON and CLIFTON arranged for prescribers, including CROWDER, Prescriber 2, and MAY, to rubber stamp compounded drug prescriptions (that is, sign without examining patients and without regard to medical necessity) for TRICARE beneficiaries they supplied.

b.   HUDSON paid CROWDER's daughter (BRACY) in exchange for signing prescriptions, and CLIFTON paid MAY in exchange for signing prescriptions.

c.   To conceal and disguise the kickbacks, HUDSON paid BRACY through an LLC, and CLIFTON paid MAY cash.

d.   HUDSON and CLIFTON paid recruiters to refer TRICARE beneficiaries willing to receive compounded prescription drugs, explaining they had prescribers who would rubber stamp prescriptions without examining patients.

e.   To conceal and disguise recruiting, recruiters signed contracts styled as if they were paid to market compounded prescription drugs to healthcare providers.

f.   HUDSON, CLIFTON, and their recruiters solicited TRICARE beneficiaries by claiming anyone with TRICARE could receive the compounded drugs at little or no cost to themselves, explaining they could pick whatever drugs they wanted, promising to secure their prescriptions, telling them they would not have to consult

the prescriber, and, at times, offering to pay them for agreeing to receive the drugs.

g.  Induced by the prospect of low- or no-cost drugs, the lack of obligations on their part to visit with a prescriber, and, at times, the prospect of being paid, numerous TRICARE beneficiaries agreed to receive the drugs.

h.  Recruiters referred TRICARE beneficiaries to HUDSON and CLIFTON by forwarding their insurance-related information, or pre-filling compounded drug prescriptions that listed the same insurance-related information, and which compounded drugs to dispense. If recruiters provided the insurance-related information only, HUDSON and CLIFTON pre-filled prescriptions themselves.

i.  Recruiters did not give (nor did HUDSON or CLIFTON require) information prescribers use to determine if prescriptions are medically necessary (*e.g.*, medical history, physical condition, chief complaint, current medications).

j.  HUDSON and CLIFTON forwarded pre-filled prescriptions for TRICARE beneficiaries to CROWDER, Prescriber 2, and MAY knowing they would sign without examining patients and without regard to medical necessity.

k.  Signed prescriptions were directed to the pharmacy, which shipped compounded drugs to beneficiaries via interstate carriers and billed TRICARE.

l.  Payment followed on a monthly basis, first to HUDSON, then to his subordinates, including CLIFTON.

m.  Payout reports documenting patient, prescriber, drugs, and what TRICARE paid accompanied payments from HUDSON to his subordinates. CLIFTON circulated similar reports to his recruiters, whom he also paid monthly.

n.  To conceal and disguise the conspiracy so prescriptions and payouts continued,

HUDSON, CLIFTON, and their coconspirators discussed the need for TRICARE beneficiaries to act as if they knew and had spoken to their prescriber and, if necessary, deny being paid for prescriptions if they spoke to the pharmacy. Prescribers were also expected to keep up the ruse if contacted.

o.  To conceal and disguise the conspiracy from federal law enforcement after the investigation began, HUDSON, CLIFTON, and their coconspirators again discussed the need for TRICARE beneficiaries to act as if they knew and had spoken to their prescriber and deny being paid; prescribers were again expected to keep up the ruse.

p.  When federal law enforcement issued subpoenas for medical records related to the prescriptions, to continue concealing and disguising the conspiracy, with the agreement and assistance of HUDSON and CLIFTON, among others, MAY and CROWDER fabricated medical records to give the impression they had examined patients before signing prescriptions, thereby keeping up the lie.

*Effect on TRICARE*

98.  Had TRICARE and Express Scripts known the prescriptions at issue were signed without examining patients, were signed without regard to medical necessity, and were influenced by kickbacks to TRICARE beneficiaries, recruiters, and prescribers, they would not have authorized payment on the claims.

99.  Defendant and his coconspirators caused TRICARE to suffer a loss of over $12 million.

*Overt Acts*

100.  On or about the dates listed below, in furtherance of the conspiracy and to accomplish the objects of the conspiracy, Defendant, HUDSON, CLIFTON, MAY, CROWDER, BRACY, and

others known and unknown to the Grand Jury, committed, the following overt acts, among others,

within the Eastern District of Arkansas and elsewhere:

| OA | Appx. Date | Description |
|----|-----------|-------------|
| 1 | January 15, 2015 | HUDSON texted BENSON "Soon as it ships, the cash register rings. Woo[.]" |
| 2 | January 26, 2015 | HUDSON texted BRACY "We may have to do $1000 per patient […] Still making good money." |
| 3 | January 30, 2015 | CLIFTON signed a $51.00 check payable to J.C. |
| 4 | February 5, 2015 | BENSON texted HUDSON "Hey my cousin goes to drill this weekend, she said she has 6 more for Monday[.]" |
| 5 | February 6, 2015 | CLIFTON emailed a blank Pharmacy 1 prescription form to a subordinate, writing "The best combination on this script pad: Pain, Scar, Vitamin= 50,000 Pain, Scar, ED Wellness Vitamin= 60,000[.]" |
| 6 | March 6, 2015 | At approximately 11:49 AM, CLIFTON emailed MAY a pre-filled prescription for E.V. and her husband ("Doc - Mar 6, 2015, 11-48 AM.pdf"). |
| 7 | March 6, 2015 | At approximately 11:56 AM, MAY eSigned E.V.'s pre-filled prescription. |
| 8 | March 25, 2015 | At approximately 5:32 PM, CLIFTON emailed MAY thirteen pre-filled prescriptions ("[Pharmacy 1] prescriptions - Mar 25, 2015, 2-52 PM.pdf"), including one for P.P., writing "Here is 13. Boom! Let's get these turned in as quickly as possible." |
| 9 | March 25, 2015 | At approximately 5:44 PM, MAY eSigned all thirteen pre-filled prescriptions ("[Pharmacy 1] prescriptions - Mar 25, 2015, 2-52 PM.pdf"). |
| 10 | March/April 2015 | CLIFTON sent J.C. a Stetson cowboy hat with approximately $1,200 cash stuffed inside. |
| 11 | April 2, 2015 | CLIFTON emailed a blank Pharmacy 1 prescription form to a subordinate, writing "Here is the prescription pad you requested. I would love to have you and your fiance as part of my team. Present the options to people with Tri care insurance and if they would like to have any of them make sure to get their Name DOB Address Phone Number SSN or Tricare insurance ID number which is basically the same thing." |
| 12 | April 5, 2015 | CLIFTON emailed Recruiter 8 "Make sure the scripts say Dr. Joe May. That's his official name. We have just always called him Jay." |
| 13 | April 9, 2015 | Recruiter 2 texted S.P.'s insurance information to HUDSON. |
| 14 | April 9, 2015 | CLIFTON emailed Recruiter 7 "download Turboscan on your phone. If you print out some script pads, you can simply fill them out and take a picture in the app and email it to me." |
| 15 | April 24, 2015 | BRACY texted HUDSON "This is our last month before changes in may. Need it to be a big one[.]" |

| 16 | April 24, 2015 | At approximately 10:23 AM, CLIFTON emailed MAY six pre-filled prescriptions ("6- part 2.pdf"), including prescriptions for the husband and son of Y.H., who had attended the National Guard meeting. |
|---|---|---|
| 17 | April 24, 2015 | At approximately 11:41 AM, MAY eSigned all six pre-filled prescriptions ("6- part 2.pdf"). |
| 18 | April 24, 2015 | At approximately 1:14 PM, BRACY forwarded CROWDER five pre-filled prescriptions ("donna crowder.pdf") from HUDSON, including a prescription for Y.H., who had attended the National Guard meeting. |
| 19 | April 30, 2015 | At approximately 9:36 AM, CLIFTON emailed MAY six pre-filled prescriptions ("Doc - Apr 30, 2015, 9-27 AM.pdf"). |
| 20 | April 30, 2015 | At approximately 9:45 AM, MAY eSigned all six pre-filled prescriptions ("Doc - Apr 30, 2015, 9-27 AM.pdf"). |
| 21 | May 3, 2015 | BENSON signed a $1,000 check payable to P.P. |
| 22 | May 7, 2015 | HUDSON texted CLIFTON "http://www.cbsnews.com/news/ free-pain-meds-for-veterans-cost-taxpayers-big-bucks/[.]" |
| 23 | May 19, 2015 | Upon receipt of his April 2015 payout report showing MAY had signed all of the prescriptions for his TRICARE beneficiaries, Recruiter 7 emailed CLIFTON "What will I need to pay joe?" |
| 24 | May 22, 2015 | HUDSON texted BENSON "Just sent you payroll for April Don't text. I'll call you to discuss I'll call you when I land. Derek's name is on there bcuz dr may is tagged to him." |
| 25 | May 28, 2015 | HUDSON texted CLIFTON "Hashtag for the day… Glenn, is my check ready? # Lol[.]" |
| 26 | May 28, 2015 | CLIFTON texted HUDSON "Haha! Meeeee toooo Jay already called asking this morning too...even the rich man[.]" |
| 27 | May 28, 2015 | CLIFTON signed a $37,101.82 check payable to Recruiter 7 with the memo line "April Commission[.]" |
| 28 | May 29, 2015 | HUDSON signed a $336,500 check payable to JC CUSTOM with memo line "April commission payment[.]" |
| 29 | May 29, 2015 | CLIFTON signed a $70,437.41 check payable to Recruiter 8's wife with memo line "April Commission[.]" |
| 30 | May 29, 2015 | CLIFTON signed a $20,398.65 check payable to Recruiter 6 with the memo line "April Commission[.]" |
| 31 | June 26, 2015 | CLIFTON emailed the CLIFTON Recruiters a blank Pharmacy 1 prescription form, writing "I am including the script pads each [sic] of you to fill out for your patients that are interested. One of the big changes that is also being made is that the pharmacy will be contacting patients to make sure they want the prescriptions. Make sure your patients are aware of this and it will put you proactively ahead of any issues you may encounter." |
| 32 | June 29, 2015 | At approximately 12:27 PM, CLIFTON emailed MAY ten pre-filled prescriptions ("Doc - Jun 29, 2015, 12-23 PM.pdf"). |
| 33 | June 29, 2015 | At approximately 12:32 PM, MAY eSigned all ten pre-filled prescriptions ("Doc - Jun 29, 2015, 12-23 PM.pdf"). |

| 34 | July 10, 2015 | Recruiter 5 texted HUDSON "Are you mentioning a dollar amount to your prior refill folks? Suggestion or should I wait to see exactly what pays so I won't regret or get upside down. ??" |
|---|---|---|
| 35 | July 14, 2015 | HUDSON texted BRACY "I have to give my patients 200 for helping and I pay there copay of $40." |
| 36 | July 14, 2015 | Recruiter 3 texted B.T.'s insurance information to HUDSON. |
| 37 | July 23, 2015 | CLIFTON texted HUDSON "Did you need Dr. May to sign anything?" |
| 38 | July 27, 2015 | Recruiter 4 texted HUDSON "Do They need to know exactly what scripts they are getting?" |
| 39 | July 27, 2015 | HUDSON texted Recruiter 4 "Shouldn't but All were pain, scar, and antifungal[.]" |
| 40 | July 29, 2015 | HUDSON texted an out-of-state recruiter with multiple out-of-state TRICARE beneficiaries awaiting prescription's "Can't do any out of state rx's!! Doctor won't do any as word has come down to him about the audits that are being done. Had a patient that got called bro." |
| 41 | August 26, 2015 | At approximately 5:32 PM, CLIFTON emailed MAY eighteen pre-filled prescriptions ("Scripts MB 21.pdf"). |
| 42 | August 26, 2015 | At approximately 6:31 PM, MAY eSigned all eighteen pre-filled prescriptions ("Scripts MB 21.pdf"). |
| 43 | August 27, 2015 | HUDSON texted CLIFTON "[Marketer 1] called and asked if dr may could call and talk to [Redacted] at the pharmacy to verify things with them. They were pretty upset today about what happened, but would feel better if the pharmacist could talk to him." |
| 44 | August 28, 2015 | HUDSON texted Marketer 1 "Derek is talking to Dr. May today. He's at a funeral as his wife's grandfather passed. He's asking dr may to call [Redacted]. Can you send her cell?" |
| 45 | August 31, 2015 | Recruiter 3 texted HUDSON "on my way to [B.T.]'s house [...] I'm going to try to answer her questions but I'm probably going to need you...I'm also going to give her the $100 plus copay to try to calm her down even though I haven't been paid yet…" |
| 46 | September 29, 2015 | At approximately 11:37 AM, CLIFTON emailed MAY "New and better formulations. Please sign asap"; the subject line read "Doc - Sep 28, 2015, 9-41 PM.pdf" but there was no file attached. |
| 47 | September 29, 2015 | At approximately 12:15 PM, CLIFTON emailed MAY eight pre-filled prescriptions ("Doc - Sep 28, 2015, 9-41 PM.pdf"), writing "Try this one instead[.]" |
| 48 | September 29, 2015 | At approximately 12:18 PM, MAY eSigned all eight pre-filled prescriptions ("Doc - Sep 28, 2015, 9-41 PM.pdf"). |
| 49 | October 4, 2015 | Upon receipt of her September 2015 payout report showing MAY signed prescriptions for each one of her TRICARE beneficiaries, Recruiter 6 emailed CLIFTON "How much for dr?" |
| 50 | October 12, 2015 | CLIFTON texted HUDSON "$210 minus half for tax$105 then dr's cut then patients cut..... Yikes[.]" |

| 51 | January 21, 2016 | CROWDER lied to the FBI. |
| 52 | January 21, 2016 | BRACY texted HUDSON "Emergency!!!! Call me ASAP!" |
| 53 | January 21, 2016 | HUDSON texted Marketer 1 "Call please! Emergency[.]" |
| 54 | January 26, 2016 | MAY lied to the FBI. |
| 55 | January 26, 2016 | CLIFTON texted HUDSON "Call asap[.]" |
| 56 | February 17, 2016 | CROWDER produced fabricated medical records. |
| 57 | February 29, 2016 | MAY produced fabricated medical records. |
| 58 | March 3, 2016 | HUDSON texted CLIFTON "http://crimeblog.dallasnews.com/ 2016/02/drug-compounders-marketing-firm-busted-for-alleged-massive-health-care-fraud-involving-doctor-kickbacks.html/[.]" |
| 59 | May 27, 2016 | CLIFTON texted HUDSON "people are getting called again[.]" |
| 60 | June 23, 2016 | BRACY produced fabricated payout reports that attributed her payments to prescribers other than her mother, CROWDER. |
| 61 | December 6, 2016 | CLIFTON produced altered payout reports on behalf of JC CUSTOM that omitted patient names. |
| 62 | January 12, 2017 | HUDSON produced altered payout reports on behalf of MAJOR HEALING that omitted prescriber names. |

All in violation of Title 18, United States Code, Section 371.

FORFEITURE ALLEGATION ONE

101. Upon conviction of Count One, Defendant KEITH BENSON, shall forfeit to the United States, under Title 18, United States Code, Section 982(a)(7) a monetary judgment in the amount of $727,679.30, which represents all property constituting or derived from proceeds traceable to the offense.

CODY HILAND
United States Attorney

ALEXANDER D. MORGAN (0390930)
STEPHANIE G. MAZZANTI (2006298)
Assistant United States Attorneys
425 West Capitol Avenue, Suite 500
Little Rock, Arkansas 72201
(501) 340-2600
alex.morgan@usdoj.gov