U. S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

FILED

JUL 29 2020

JAMES W. McCORMACK, CLERK
IN OPEN COURT
By: H. Clark
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 4:20-CR-132 LPR |
| | ) | |
| KEITH BENSON | ) | 18 U.S.C. § 371 |

## PLEA AGREEMENT

The United States Attorney for the Eastern District of Arkansas, Cody Hiland, by and through Alexander D. Morgan and Stephanie G. Mazzanti, Assistant United States Attorneys, and Keith Benson, Defendant, represented by the undersigned counsel, hereby agree to the following terms and conditions in connection with the above referenced proceedings.

1. <u>GUILTY PLEA</u>: Defendant will waive Indictment and permit the United States to proceed by Information charging him with conspiring to violate the Anti-Kickback Statute in violation of Title 18, United States Code, Section 371. Defendant also agrees to enter a plea of guilty to the Information. The parties execute this plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(A).

2. <u>ELEMENTS OF THE CRIME</u>: The parties agree the elements of the offense to which Defendant will plead guilty are:

   A. two or more persons agreed to violate the Anti-Kickback Statute;

   B. Defendant voluntarily and intentionally joined in the agreement;

   C. Defendant knew the purpose of the agreement; *and*

   D. while the agreement was in effect, a person or persons who had joined in the agreement knowingly did one or more acts for the purpose of carrying out or carrying forward the agreement.

Defendant agrees he is guilty of the offense charged and each of these elements is true.

3. PENALTIES:

A. STATUTORY PENALTIES: The penalty for the charge set forth in Count One is not more than five (5) years' imprisonment, a fine of not more than $250,000, not more than three (3) years supervised release, and a $100 special assessment.

B. SUPERVISED RELEASE: Supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if he violates one or more of the conditions of any supervised release imposed, he may be returned to prison for all or part of the term of supervised release, which could result in Defendant serving a total term of imprisonment greater than the statutory maximum stated above.

4. WAIVERS: Defendant acknowledges that he has been advised of and fully understands the nature of the charges to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law. Defendant further understands that by entering into this Agreement and Addendum, he is waiving certain constitutional rights, including, without limitation, the following:

A. The right to appeal or collaterally attack, to the full extent of the law, all non-jurisdictional issues, including any forfeiture or restitution order, as follows:

(1) Defendant waives the right to appeal all non-jurisdictional issues including, but not limited to, any issues relating to pre-trial motions, hearings and discovery and any issues relating to the negotiation, taking or acceptance of the guilty plea or the factual basis for the plea, including the sentence imposed or any issues that relate to the establishment of the Guideline range, except that Defendant reserves the right to appeal claims of prosecutorial

misconduct and Defendant reserves the right to appeal the sentence if he makes a contemporaneous objection because the sentence imposed is above the Guideline range established at sentencing;

(2)     Defendant expressly acknowledges and agrees that the United States reserves its right to appeal his sentence under Title 18, United States Code, Section 3742(b) and *United States v. Booker*, 543 U.S. 220 (2005);

(3)     Defendant waives all rights to collaterally attack the conviction and sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims based on ineffective assistance of counsel or prosecutorial misconduct;

(4)     Defendant waives the right to have the sentence modified pursuant to Title 18, United States Code, Section 3582(c)(2);

(5)     Defendant waives the right to appeal the Court's determination of the amount of restitution and subsequent restitution order, if any; *and*

(6)     Defendant waives the right to appeal the Court's determination of any forfeiture issues and subsequent forfeiture order, if any.

B.     The right to plead not guilty or to persist in that plea if it has already been made, and the right to a speedy and public trial before a jury;

C.     The right to be presumed innocent and to have the burden of proof placed on the United States to establish guilt beyond a reasonable doubt;

D.     The right to confront and cross examine witnesses;

E.     The right to testify in his own behalf if Defendant so chooses, or, the right to remain silent and not be compelled to testify, and to have that choice not used against him;

F.     The right to call witnesses and to require those witnesses to appear by

issuing subpoenas.

    G.    Pursuant to Federal Rule of Criminal Procedure 11(b)(1)(O), Defendant understands that upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

    5.    STIPULATIONS: The United States and Defendant stipulate to the following:

    A.    The base offense level is 8 under U.S.S.G. § 2B4.1(a).

    B.    A 14-level adjustment applies under U.S.S.G. §§ 2B1.1(b)(1)(H) and 2B4.1(b)(1)(B) because Defendant gained in excess of $550,000.

    C.    Defendant is eligible for a 2-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) unless he takes any action between entry of the guilty plea and imposition of the sentence that is inconsistent with acceptance of responsibility. If the offense level is 16 or greater, determination of whether Defendant is eligible for a third point reduction for acceptance of responsibility U.S.S.G. § 3E1.1(b) will be made by the United States at the time of sentencing.

    D.    No other enhancements or reductions under Chapters 2, 3, or 5 of the Guidelines apply, other than those specifically set out in this agreement and its addendum.

    E.    Defendant specifically waives any and all challenges to searches, seizures, arrests, statements, and forfeitures that have taken place as of the date of the execution of this plea agreement by Defendant in this investigation by any entity, and in any forum where the offense may be pursued and/or forfeiture may be sought. Defendant will assist in executing any requested waiver of challenge and relinquishment of rights to any and all assets that have been seized to date in this investigation by any participating agency or department, in any forum where the forfeiture may be sought.

The parties understand that the Court is not bound by these stipulations. Defendant further understands that if the Court does not accept this Plea Agreement, Defendant is not entitled to withdraw the guilty plea or otherwise be released from his obligations under this Agreement and Addendum.

6. SENTENCING GUIDELINES: It is specifically understood by Defendant that the Sentencing Guidelines are not mandatory but are advisory, and that the Court is to consult them in determining the appropriate sentence. Defendant understands that the determination of the applicability of the Guidelines and of the appropriate sentence will be made by the Court. Defendant is aware that any estimate of the probable sentencing range under the Sentencing Guidelines that he may have received from the his counsel, the United States, or the Probation Office, is merely a prediction, not a promise, and is not binding on the United States, the Probation Office, or the Court. The United States makes no promise or representation concerning what sentence Defendant will receive, and Defendant cannot withdraw a guilty plea, or otherwise avoid the his obligations under this Agreement and Addendum, based upon the actual sentence imposed by the Court. The parties understand and agree that if the guideline range is greater or less than Defendant or the United States expected it to be, and/or the sentence imposed by the Court is greater or lesser than anticipated, neither Defendant nor the United States will be allowed to withdraw, nor request withdrawal of, the guilty plea, nor be excused from any obligation under this Agreement and Addendum.

7. ALLOCUTION: The United States reserves the right to bring any and all facts which it believes are appropriate to the attention of the Court.

8. COOPERATION IN THE SENTENCING PROCESS:

A. Defendant agrees to truthfully provide all information to the Probation Office as is needed for preparation of the pre-sentence report, including, but not limited to, criminal history information. Defendant shall voluntarily provide a complete and truthful written accounting of his criminal history to the Probation Office.

B. Defendant agrees to execute all waivers necessary for the preparation of the pre-sentence report.

C. Defendant understands and acknowledges that his obligation of disclosure regarding criminal history is not limited to arrests and convictions reported in computer databases, but requires Defendant to disclose all arrests and/or convictions, including any juvenile matters, regardless of whether he believes the arrest/conviction counts under the Sentencing Guidelines.

D. Defendant is required to comply with these obligations no later than the expiration of the date on which objections to the pre-sentence report are due.

9. FINANCIAL MATTERS:

A. FINANCIAL STATEMENT: Defendant agrees to fully and truthfully complete a Financial Statement provided by the United States Probation Office.

B. FINES: Defendant understands that unless the Court determines he is financially unable to pay a fine, the Court must impose a fine pursuant to the Sentencing Reform Act of 1984.

C. SPECIAL PENALTY ASSESSMENT: Defendant agrees to pay to the United States a special assessment of $100.00 per count, as required by Title 18, United States Code, Section 3013. This special assessment is to be paid by bank cashier's check or money order

as directed by the Court. Cashier's checks or money orders should be made payable to "Clerk, United States District Court."

      D.    RESTITUTION: The parties also state that restitution is not applicable. *United States v. Polukhin*, 896 F.3d 848, 851-52 & n.2 (8th Cir. 2018); *United States v. Yielding*, 657 F.3d 688, 718-19 (8th Cir. 2011).

    10.    DOUBLE JEOPARDY AND SUCCESSIVE PROSECUTION: The United States Attorney for the Eastern District of Arkansas will bring no further charges against Defendant for any acts or conduct arising out of the events described in the Information, which is the subject of this action, unless Defendant breaches this Agreement and Addendum.

    11.    RECORDS: Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act of 1974, Title 5, United States Code, Section 552a.

    12.    ASSET FORFEITURE AND FINANCIAL ACCOUNTABILITY:

      A.    Defendant agrees to forfeit a money judgment equal to $727,679.30, which represents the proceeds that were derived from or traceable to the offense. Defendant agrees this debt may be placed in the Treasury Offset Program. Pursuant to Title 11, United States Code, Section 523(a)(l)(C) and other pertinent bankruptcy laws, Defendant understands and agrees he cannot and will not discharge or attempt to discharge this obligation in any current or subsequent bankruptcy proceeding.

      B.    Defendant agrees to hold the United States, its agents and employees harmless from any claims whatsoever in connection with the seizure or forfeiture of property

covered by this agreement. Defendant further agrees that forfeiture of assets described above shall not be counted towards satisfaction of any special assessment, fine, restitution, or any other penalty the court may impose.

C. Defendant agrees not to assist any other individual in contesting the forfeiture of the assets described above and agrees that there was reasonable cause to seize those items. Defendant also agrees to prevent the disbursement of any and all assets described above if the disbursements are within Defendant's direct or indirect control.

D. Defendant agrees to fully disclose all assets in which he has any interest or over which he exercises control, directly or indirectly, including those held by a spouse, nominee or third party. Defendant agrees to truthfully complete the financial statement form provided by the United States Attorney's Office for the Eastern District of Arkansas by the date of his entry of a guilty plea, sign it under penalty of perjury, and provide it to the United States Attorney's Office for the Eastern District of Arkansas. Defendant agrees to provide updates with any material changes in circumstances, as described in Title 18, United States Code, Section 3664(k), which occur prior to sentencing, within seven days of the event giving rise to the changed circumstances. Prior to sentencing, Defendant agrees to notify the Assistant United States Attorney and the Financial Litigation Unit of the United States Attorney's Office for the Eastern District of Arkansas before he transfers any interest in property with a value exceeding $1,000 owned directly or indirectly, individually or jointly, by Defendant, including any interest held or owned under any name, including trusts, partnerships, and corporations. Defendant expressly authorizes the United States Attorney's Office to obtain a credit report on him. Defendant agrees to provide waivers, consents or releases requested by the United States Attorney's Office to access records to verify the his financial information. Defendant also authorizes the United States Attorney's Office to

inspect and copy all financial documents and information held by the United States Probation Office.

   E. Further, Defendant hereby withdraws all previously filed claims to, waives all interest in, and consents to the forfeiture of the above-described assets. The United States has the discretion to determine whether the forfeiture will be accomplished through an administrative or judicial proceeding, which includes any criminal, civil, state, or federal action. Defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rule of Criminal Procedure 32.2 regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the court to advise him of this, under Rule 11(b)(1)(J), at the time his guilty plea is accepted. Defendant waives any right he may have to: (1) receive notice of any non-judicial forfeiture proceeding within the time frames provided in Title 18, United States Code, Section 983, and (2) have the property returned to him if notice is not sent within those prescribed time frames.

   F. Defendant further agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. Defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States, including, but not limited to, the execution of the Consent Decree of Forfeiture and the completion of any other legal documents required for the transfer of title to the United States.

13. <u>CIVIL CLAIMS BY THE GOVERNMENT</u>: Except to the extent otherwise expressly specified herein, this Agreement and Addendum does not bar or compromise any civil or administrative claim pending or that may be made against Defendant, including but not limited to tax matters.

14. <u>EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT AND ADDENDUM</u>:

   A. Defendant acknowledges and understands that if he violates any term of this Agreement and Addendum, engages in any further criminal activity prior to sentencing, or fails to appear for any subsequent proceeding including sentencing, the United States shall have, in addition to all other rights and remedies otherwise available, the right to:

   (1) terminate this Agreement and Addendum; or

   (2) proceed with this Agreement and Addendum and

   (a) deny any and all benefits to which Defendant would otherwise be entitled under the terms of this Agreement and Addendum; and/or

   (b) advocate for any sentencing enhancement that may be appropriate.

   B. In the event the United States elects to terminate this Agreement and Addendum, the United States shall be released from any and all obligations hereunder. Defendant acknowledges and understands that the agreement of the United States to dismiss any charge is conditioned upon final resolution of this matter. If this Agreement and Addendum is terminated or if Defendant's conviction ultimately is overturned, then the United States retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this Agreement and Addendum.

C. Defendant hereby knowingly and voluntarily waives any defense based upon the applicable statute of limitations and/or the Speedy Trial Act, for any charges reinstated or otherwise filed against Defendant as a result of his breach of this Agreement and Addendum, so long as the United States initiates any otherwise time barred action within one year of termination or revocation of this Agreement and Addendum.

D. In the event that the Agreement and Addendum is terminated or if Defendant successfully moves to withdraw his plea, any statement made by him in negotiation of, or in reliance on this Agreement and Addendum, including any statements made in the course of a proffer, this Agreement, the stipulations in paragraph 5 of this Agreement, and the plea colloquy:

(1) may be used in the United States' case in chief and to cross examine Defendant should he testify in any subsequent proceeding; and/or

(2) any leads derived therefrom may be used by the United States.

Defendant waives any and all rights to the contrary and shall assert no claim under the United States Constitution, any statute, or any rule of procedure or evidence to the contrary, including Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f). Defendant has been advised of his rights pursuant to Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f) and waives these rights.

15. **PARTIES**: This Agreement and Addendum is binding only upon the United States Attorney's Office for the Eastern District of Arkansas and Defendant. It does not bind any United States Attorney outside the Eastern District of Arkansas, nor does it bind any other federal, state or local prosecuting, administrative, or regulatory authority.

16. **MISCELLANEOUS**:

    A. **MODIFICATION**: No term or provision contained herein may be modified, amended or waived except by express written agreement signed by the party to be bound thereby.

    B. **HEADINGS AND CAPTIONS**: Subject headings and captions are included herein for convenience purposes only and shall not affect the interpretation of this Agreement and Addendum.

    C. **WAIVER**: No waiver of a breach of any term or provision of this Agreement and Addendum shall operate or be construed as a waiver of any subsequent breach or limit or restrict any other right or remedy otherwise available. Any waiver must be expressly stated in writing signed by the party to be bound thereby.

    D. **RIGHTS AND REMEDIES CUMULATIVE**: The rights and remedies of the United States expressed herein upon any breach hereunder by Defendant are cumulative and not exclusive of any rights and remedies otherwise available to the United States in the event of any breach of this Agreement and Addendum by defendant.

    E. **JOINT NEGOTIATION**: This Agreement and Addendum has been mutually negotiated by the parties hereto, and any uncertainty or ambiguity existing herein shall not be interpreted against any party by reason of its drafting of this Agreement and Addendum, but instead shall be interpreted according to the application of the general rules of interpretation for arms-length agreements.

17. **NO OTHER TERMS**: This document and the Addendum completely reflect all promises, agreements and conditions made between the parties, constitute the entire agreement between the parties and supersedes any and all prior agreements or understandings between the parties, oral or written, with respect to the subject matter hereof.

18.     APPROVALS AND SIGNATURES:

    A.     DEFENDANT: Defendant has read this Agreement and Addendum and carefully reviewed every part of it with his attorney. Defendant understands and voluntarily agrees to the terms and condition of this Agreement and Addendum. Further, Defendant has consulted with his attorney and fully understands his rights with respect to the provisions of the United States Sentencing Guidelines which may apply to this case. No other promises or inducements have been made to Defendant, other than those expressly contained in this Agreement and Addendum. In addition, no one has threatened or forced Defendant in any way to enter into this Agreement and Addendum. Defendant further acknowledges he has entered into this Agreement and Addendum, consciously and deliberately, by his free choice, and without duress, undue influence or otherwise being forced or compelled to do so, and this Agreement and Addendum constitutes the legal, valid and binding obligation of Defendant, fully enforceable against him in accordance with its terms. Finally, Defendant is satisfied with the representation of his attorney in this case.

    B.     DEFENSE COUNSEL: Defense counsel acknowledges he is the attorney for Defendant, and he has fully and carefully discussed every part of this Agreement and Addendum with Defendant. Further, defense counsel has fully and carefully advised Defendant of his rights, of possible defenses, and of the consequences of entering into this Agreement and Addendum, including the possible consequences of not complying with this Agreement and Addendum. To counsel's knowledge, Defendant's decision to enter into this Agreement and Addendum is an informed and voluntary decision.

[END OF TEXT. SIGNATURE PAGE ATTACHED.]

DATED this 29 day of JULY, 2020.

                                                CODY HILAND
                                                United States Attorney

_____               _____
KEITH BENSON                                    ALEXANDER D. MORGAN
                                                  STEPHANIE G. MAZZANTI
                                                  Assistant United States Attorneys
                                                  P.O. Box 1229
_____               Little Rock, Arkansas 72203
RICHARD L. MAYS, JR.                            (501) 340-2600
ARKIE BYRD                                                  alex.morgan@usdoj.gov
Attorneys for Keith Benson

## STIPULATION

At trial the United States would have offered proof TRICARE was a federal health care program affecting commerce under 18 USC § 24(b) and 42 USC § 1320a-7b. It covered prescription drugs prescribed by licensed medical professionals after examining patients and determining the drug was needed to treat their illness or condition. TRICARE further paid in good faith reliance on the fact no kickbacks had been offered, paid, solicited, or received in the process.

Defendant Keith BENSON was friends with Albert Glenn HUDSON, who did medical sales.

Around January 2015, HUDSON offered to pay BENSON to find TRICARE beneficiaries to get Pharmacy 1 compounded drugs. HUDSON said TRICARE paid thousands of dollars per patient per month for the drugs and he (HUDSON) could get prescriptions for anyone with TRICARE regardless of where they lived without them having to consult a prescriber or share any medical information (*e.g.*, medical history, physical condition, chief compliant, current medications). All HUDSON needed was patient insurance information called for on Pharmacy 1 prescription slips. HUDSON told BENSON beneficiaries could pick their own drugs but advised pushing the most expensive ones. If TRICARE beneficiaries did not care, HUDSON said he or BENSON could chose the drugs themselves. HUDSON promised to pay BENSON a share of what TRICARE reimbursed in exchange recruiting beneficiaries. Although HUDSON said it was illegal for him (HUDSON) to pay TRICARE beneficiaries for receiving drugs, he said BENSON could do so because he was not in the medical industry. HUDSON added BENSON should target TRICARE beneficiaries he knew and could trust. BENSON agreed.

Beginning around January 2015, BENSON recruited TRICARE beneficiaries by promising to secure their prescription and offering to pay them (often $1,000) each month drugs arrived. (Refills were automatic.) BENSON added any family on TRICARE were also eligible and would receive additional monthly payments such that a family of four on TRICARE could earn $4,000 per month. Recipients would be paid regardless of whether they used the drugs, gave them away, or threw them in the trash. BENSON also paid subordinates to recruit for him including, among others, a local pastor and a cousin in the National Guard.

BENSON referred TRICARE beneficiaries to HUDSON for prescriptions by sending HUDSON pre-filled prescriptions (that is, prescriptions with patient insurance information, drug(s) to be dispensed, and, often, refill quantities already entered so prescribers need only sign) or relaying TRICARE beneficiary information alone, which HUDSON could use to pre-fill prescriptions. BENSON did not relay substantive medical information. Nor did HUDSON ask him to do so.

Every beneficiary BENSON sent HUDSON got a prescription. None had to consult prescribers. BENSON understood others were also recruiting for HUDSON too, including Recruiter 4.

HUDSON paid BENSON monthly. Payout reports accompanied every payment. Reports listed patients, prescribers, drugs dispensed, and TRICARE reimbursements.

HUDSON used Donna CROWDER, Joe David May a.k.a. Jay MAY, and Prescriber 2 to rubber stamp prescriptions for TRICARE beneficiaries from BENSON. BENSON knew HUDSON paid

Exhibit A

CROWDER's daughter (Jennifer Crowder f.k.a. Jennifer BRACY) for her signing prescriptions because HUDSON at times deducted some or all of BRACY's cut from his payout. BENSON knew HUDSON paid a mutual friend for securing for Prescriber 2's signature. And Benson knew HUDSON paid Derek CLIFTON for securing MAY's signature.

At various points BENSON and CLIFTON discussed the operation. BENSON told CLIFTON he (BENSON) was paying patients to receive drugs, some of whom got their prescription via MAY. And CLIFTON told BENSON he (CLIFTON) was also paying patients to receive drugs, and he confirmed MAY was rubber stamping prescriptions without consulting patients.

Around March 2015, BENSON met two congregants with military ties at their NLR church. After confirming they had TRICARE, BENSON offered to secure their prescriptions and to pay them $1,000 each month drugs arrived. Both agreed. One of the congregants was P.P., whom BENSON later paid $1,000 and whose prescription was signed by MAY.

Around March 16, 2015, BENSON led a meeting at a NLR National Guard facility. BENSON offered to get attendees with TRICARE prescriptions and promised to pay them $1,000 each month drugs arrived, adding family on TRICARE were eligible too. Numerous attendees agreed. Afterwards, BENSON texted HUDSON "Just got like 15 more." One of the attendees was R.L., whom a BENSON subordinate later paid $1,000 and whose prescription was signed by MAY.

Also around March 16, 2015, HUDSON warned BENSON and other subordinates TRICARE reimbursements were set to fall in May 2015 so they should run everything they had before then. BENSON thereafter increased his recruiting efforts.

Around early May 2015, CBS News aired an exposé about marketers targeting people with TRICARE to receive expensive compounded drugs. This prompted BENSON to raise concerns with HUDSON. HUDSON told BENSON they had nothing to worry about because the story was about a different pharmacy. HUDSON added their pharmacy knew they were paying patients, paying prescribers, and using prescribers to rubber stamp prescriptions. BENSON interpreted this to mean no one would cry foul because everyone was in on it. Nevertheless, HUDSON told BENSON to keep what they were doing quiet and make sure beneficiaries denied being paid.

Around May 15 and May 18, 2015, HUDSON shared Pharmacy 1 emails with BENSON about patient complaints. Among other things, complaints cited recruiters offering money and pursuing beneficiaries, prescribers signing prescriptions for patients they do not know on the "down low", and patients getting different drugs than what they requested from recruiters. HUDSON told BENSON to make sure beneficiaries denied being paid and claimed to know their prescriber.

Also around May 2015, HUDSON told BENSON learned TRICARE had stopped processing compounded drug claims.

Around late July 2015, HUDSON told BENSON TRICARE was again processing compounded drug claims and Pharmacy 1 would now call patients before filling prescriptions. HUDSON told BENSON beneficiaries should deny being paid and act like they knew and consulted prescribers. HUDSON gave BENSON a list of his beneficiaries alongside their prescribers so he (BENSON)

could make sure they knew their prescriber's name if asked. Also around this time, HUDSON warned BENSON they could no longer run prescriptions for out-of-state beneficiaries.

The operation continued into the fall of 2015, when it fizzled out because TRICARE was paying less and less for the prescriptions. To that point, HUDSON had paid BENSON over $1.4 million for recruiting over 100 TRICARE beneficiaries to receive drugs. BENSON kept $727,679.30 for himself and paid the remainder to his subordinates for helping to recruit.

Around early 2016, HUDSON told BENSON federal agents searched compounding pharmacies (including Pharmacy 1) and interviewed CROWDER. HUDSON said they would be fine so long as people stayed on script: beneficiaries were not paid and knew and had consulted prescribers. A short time later, HUDSON told BENSON to warn beneficiaries CROWDER may be calling because she was creating records for them.

Around November 2016, BENSON was subpoenaed for business records and told HUDSON. HUDSON said others were getting subpoenas too. HUDSON emailed BENSON payout reports, which BENSON later produced in response to the subpoena. Unlike payout reports circulated in 2015, the versions HUDSON sent in 2016 after news of subpoenas omitted prescriber names.

During and in furtherance of the conspiracy, BENSON sent and received the text messages and signed the $1,000 check attributed to him in the Overt Acts section.

DATED this 19 day of JULY, 2020.

CODY HILAND
United States Attorney

_____
KEITH BENSON

_____
RICHARD L. MAYS, JR.
ARKIE BYRD
Attorneys for Keith Benson

_____
ALEXANDER D. MORGAN
STEPHANIE G. MAZZANTI
Assistant United States Attorneys
P.O. Box 1229
Little Rock, Arkansas 72203
(501) 340-2600
alex.morgan@usdoj.gov